Morgan L. Cummings, Bar No. 12482
HANSEN WRIGHT EDDY & HAWS, P.C.
233 South Pleasant Grove Blvd., Ste. 202
Pleasant Grove, Utah 84062
Telephone: (801) 443-2380
Facsimile: (801) 796-0984
e-mail: mcummings@centralutahlaw.com

*Attorneys for Construction Capital Lending, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF UTAH, CENTRAL DIVISON**

| In re: | |
|---|---|
| **RONALD AND MARY BAILEY,** | Bankruptcy Case No. 10-32980 |
| Debtors. | Chapter 13 |
| | [FILED ELECTRONICALLY] |

**CONSTRUCTION CAPITAL LENDING, INC.'S OBJECTION TO
CONFIRMATION OF THE DEBTORS' CHAPTER 13 PLAN**

Construction Capital Lending, Inc. ("CCL"), by and through its counsel of record, HANSEN WRIGHT EDDY & HAWS, P.C., hereby objects to the Debtors' Chapter 13 Plan dated October 3, 2011 (Doc. # 127), and provides the following in support hereof:

**I.    THE DEBTORS' PLAN IS NOT FEASIBLE.**

CCL objects to the Debtors' Plan because it is simply not feasible, and thus violates, *inter alia*, 11 U.S.C. § 1325(a)(6). Section 1325(a)(6) provides that a Chapter 13 Plan can be confirmed only if "the debtor[s] will be able to make all payments under the plan and to comply with the plan." *Id*. *See also*, *Hamilton v. Lanning*, __ U.S. __, 130 S. Ct. 2464, 2476, 177 L.Ed.

1

2d 23 (2010). In the present case, there is no possible way for the Debtors to "make all payments under the plan and to comply with the plan." Specifically, the Debtors' Plan provides that nonpriority unsecured creditors shall receive "[n]ot less than 100%" of their allowed claims, "plus not less than 2% interest thereon." *See*, Debtors' Plan, § 3. Until this point, the Debtors have only been paying $3,110.00[1] per month to the Chapter 13 Trustee. *See*, Doc. # 117 at § 1(a). However, presumably beginning in October 2011, the Debtor propose to pay $4,500.00 towards the Chapter 13 Plan. *See*, Doc. # 127 at § 1(a). In the event that the Debtors actually make each of the proposed Plan payments, the Debtors will have paid only approximately $251,930.00 by the end of the 60-month Plan term. However, adding the total claims of just three (3) of Debtors' unsecured creditors,[2] the Debtors must pay at least $388,084.39 into the Plan ($427,432.27 with 2% interest). Consequently, the Debtors' Plan payments will be deficient by at least $136,000.00. Alternatively, the Debtors would need to make payments well beyond the applicable 60-month Plan term. However, "the court may not approve a period that is longer than five years." *In re Black*, 292 B.R. 693, 699 (B.A.P. 10th Cir. 2003). Therefore, because the Debtors are factually unable to "comply with the plan," the Plan as proposed is not feasible. As a result, the Court should not confirm the Debtors' Plan. *See*, *In re Lanning*, 545 F.3d 1269, 1281-82 (10th Cir. 2008).

      CCL recognizes that the Debtors have also provided that if CCL and US Bank do not

---

1 Actually, the Debtors paid much less than this amount for a significant time. *See*, *inter alia*, Doc. ## 17 at § C(4)(a)-(b), 24 at § 1(a), 30 at § 1(a), and 59 at § 1(a).
[2] CCL's Proof of Claim was filed for $85,420.32; eCast's Proof of Claim was filed for $9,363.09; and U.S. Bank's Proof of Claim was filed for $293,300.98.

2

substantially reduce their respective proof of claim amounts, "then the plan will return only approximately 60% to non-priority unsecured creditors." *See*, Doc. # 127 at § 3. This particular provision of the Debtors' Chapter 13 Plan is also addressed within §§ II and III of this Objection. However, CCL briefly wishes to note that, aside from the other glaring problems with this provision, the Debtors' calculations are simply incorrect. Presumably the Debtors arrive at an "approximately 60%" return to non-priority unsecured creditors by dividing the total amount of proposed payments ($251,930.00) by the total amount of unsecured claims reflected on the Court's Claims Register ($420,925.62), which equals approximately 59%. However, because the Debtors have obtained various orders disallowing certain unsecured claims, the total amount of remaining unsecured claims is actually $388,084.39, which would result in a return of approximately 65% to unsecured creditors. In fact, if the Debtors were to contribute all of their disposable income as required for the entire 60 months, the Debtors would actually end up having paid approximately $288,124.09 towards the Chapter 13 Plan, which would result in a return of approximately 74% to unsecured creditors.

Therefore, based upon the foregoing, CCL respectfully objects to confirmation of the Debtors' Chapter 13 Plan.

**II.     THE DEBTORS' PLAN FAILS TO CONTRIBUTE ALL OF DEBTORS' DISPOSABLE INCOME.**

In addition to the aforementioned problems with feasibility, the Debtors' Plan also fails to contribute all of the Debtors' projected disposable income to the Plan, in violation of 11 U.S.C. § 1325(b)(1)(B). Specifically, in the Debtors' most recent Schedule "J" (Doc. # 126, p. 2), the

Debtors indicate that they have $5,055.28 of disposable income which could be contributed to the Chapter 13 Plan. Notwithstanding, the Debtors' have only been paying $3,110.00[3] into the Plan, and propose to only pay $4,500.00 towards the Chapter 13 Plan from this point forward. *See*, Doc # 127 at § 1(a). In fact, the Debtors have failed to contribute all disposable income to the Chapter 13 Plan since the inception of this case. *See*, *inter alia*, Doc. ## 126, 118, 8 at p. 37. *Compare*, Doc. ## 17 at § C(4)(a)-(b), 24 at § 1(a), 30 at § 1(a), 59 at § 1(a), 117 at §1(a), and 127 at § 1(a). As a result, the Court should refuse to confirm the Debtors' Plan. Even if the Debtors were to contribute their additional disposable income to the Plan, the Debtors' Plan would still not be feasible in that the Plan still would be factually unable to repay the unsecured creditors "[n]ot less than 100%" of their allowed claims, "plus not less than 2% interest thereon." *See*, Debtors' Plan, § 3, thus providing the Court yet another basis for denying the Debtors' Plan. As a result, the Court should not confirm the Debtors' Plan.

In addition to the foregoing, and as noted above, even if the Debtors were to contribute all disposable income to their proposed Chapter 13 Plan, unsecured creditors would receive approximately 75% of their total claim amounts, rather than the 60% which the Debtors propose. As such, the Debtors' Plan should not be confirmed.

### III.   THE DEBTORS' PLAN UNFAIRLY DISCRIMINATES AGAINST CCL.

The Debtors' Plan also unfairly discriminates against CCL and other similarly-situated unsecured creditors, and therefore violates, *inter alia*, 11 U.S.C. § 1322(b)(1). For example, the Debtors' Plan would require only CCL and one other unsecured creditor to substantially reduce

---

[3] And significantly less at times. *See*, Doc. ## 17 at § C(4)(a)-(b), 24 at § 1(a), 30 at § 1(a), and 59 at § 1(a)

4

the amount of their respective claims in order for the plan to make adequate distributions. *See*, Doc. # 27 at § 3. However, no other unsecured creditors (such as eCast, for example) are being asked or being required to make "a substantial reduction in [its] claims." *See*, *Id*. Consequently, the Debtors' proposed Chapter 13 Plan is blatantly and unfairly prejudicial. Therefore, the Court should refuse to confirm the Plan.

In addition to the foregoing, the Debtors have been paying another unsecured creditor (one which never even filed a proof of claim), AXA Equitable, the sum of $1,000.00 since the inception of this case. *See*, *inter alia*, Debtors' Original Chapter 13 Plan, on file herein. Bankruptcy courts have recently held that "when a debtor proposes to pay an unsecured creditor outside his or her chapter 13 plan, this constitutes separate classification of a claim." *In re Abaunza*, 452 B.R. 866, 871 (Bankr. S.D. Fla. 2011). *See also*, *inter alia*, *In re Edwards*, 263 B.R. 690 (Bankr. D.R.I. 2001) (holding that debtor could not make payments to student loan creditor outside of plan while paying nothing to other unsecured creditors without a showing that the plan did not unfairly discriminate). Consequently, the Debtors have unfairly discriminated against CCL by treating another similarly-situated unsecured creditor in a far superior manner, but without providing any justification therefor pursuant to *In re Whitelock*, 122 B.R. 582 (Bankr. D. Utah 1990). However, § 1322(b)(1) expressly provides that the Debtors' Plan "may not discriminate unfairly against any class so designated." 11 U.S.C. § 1322(b)(1). Even though the Debtors' current Chapter 13 Plan omits AXA Equitable (presumably because AXA Equitable has been paid in full), the fact remains that AXA has received substantial payments, thus resulting in unfair and incurable discrimination.

Additionally, it is not difficult to imagine a very probable scenario wherein the Debtors' bankruptcy case is eventually dismissed a few months or years from now,[4] after AXA has already received substantial payments outside of the Plan, while CCL and other unsecured nonpriority creditors have only received pennies on the dollar. Alternatively, and as noted above, the Debtors Plan is simply not feasible. Consequently, this case may realistically result in a situation where AXA has already received substantial (if not full) payment outside of the Plan, while CCL and others are left far short of full payment on their unsecured claims. Moreover, because the Debtors were making substantial payments directly to AXA outside of the Plan since the inception of this case (for approximately one (1) year), it would be impossible for the Debtors to cure such unfair discrimination at this point.

Finally, based upon the express language of the Debtors' Plan, it appears that the Debtors are suggesting that only "allowed and undisputed…unsecured claimants will be paid in full plus all properly accruing interest," while disputed claimants, such as CCL, will only receive "prorata payment[s]." *See*, Debtors' Plan, at Preamble § C, and § 3. Therefore, if the Debtors' Plan is interpreted literally, this could result in all other unsecured creditors receiving full payment, but CCL only receiving some unspecified prorata amount short of full payment (even after CCL's claim is allowed by this Court). There is no question that this type of treatment unfairly discriminates against CCL.

Based upon the foregoing, it is not difficult to see that the Debtors' Plan unfairly

---

[4] Especially since the Debtors are approaching, or have already reached, retirement age and may, therefore, experience a reduction in their monthly income. *See*, *In re Smith*, 8 B.R. 543 (Bankr. D. Utah 1981) (holding that significantly reduced income, or no income at all may bar confirmation of Chapter 13 Plan).

discriminates against CCL. As a result, the Court should not confirm the Debtors' Plan.

### IV. THE DEBTORS' PLAN HAS NOT BEEN FILED IN GOOD FAITH.

For a multitude of reasons, it is clear that the Debtors' Plan has not been filed in good faith, in violation of 11 U.S.C. §§ 1325(a)(3) and (7). This Court has held that "the court has an 'affirmative duty' to review the plan and to ensure that it complies with the applicable provisions of the Bankruptcy Code." *See*, *In re Garner*, 399 B.R. 267, 271 (Bankr. D. Utah 2009) (Thurman, J.) (internal citations omitted). The Court will only confirm a plan if "the plan complies with the provisions of [chapter 13] and with other applicable provisions of this title." *Id*. (citing 11 U.S.C. § 1325(a)(1)). However, when the Debtors' Plan has been presented in bad faith, there is a "bar to confirmation." *Id*. (citing *In re Montoya*, 341 B.R. 41, 46 (Bankr. D. Utah 2006). Furthermore, the provisions of § 1325 are not mere suggestions, but rather they "are mandatory requirements for the confirmation of a Chapter 13 plan." *In re Jones*, 530 F.3d 1284, 1290 (10th Cir. 2008). In determining whether a Chapter 13 Plan has been filed in good faith, this Court has often referenced the *Flygare* factors[5] as a guide. *See*, *In re Lundahl*, 307 B.R. 233, 243-44 (Bankr. D. Utah 2003) (Thurman, J.). *See also*, *In re Hildreth*, 2006 WL 4846383, at fn 8 (Thurman, J.), and *In re Martin*, 373 B.R. 731 (Bankr. D. Utah 2007) (Thurman, J.). Based upon the Debtors' Plan and other documents filed herein, as well as a review of the *Flygare* factors, it is clear that the Debtors' Plan has not been filed in good faith. As a result, the Court

---

[5] Including, *inter alia*, (i) the amount of proposed payments and amount of debtor's surplus; (ii) debtor's employment history, ability to earn, and likelihood of future increases in income; (iii) the probable or expected duration of the plan; (iv) the accuracy of the plan's statements; (v) the extent of preferential treatment between classes of creditors; (vi) the extent to which secured claims are modified; (vii) the extent to which secured claims are modified; (viii) the existence of special circumstances; (ix) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (x) the burden which the plan would place upon the trustee." *See*, *In re Hildreth*, *supra*.

should refuse to confirm the Debtors' Plan.

### a. Previously Discussed *Flygare* Factors.

CCL has already addressed many of the *Flygare* factors in greater detail, above. For example, CCL has shown the Debtors' lack of good faith in failing to contribute all of their disposable income to the Plan. *See*, § II, above. CCL has also raised the issue of the Debtors' ability to earn and likelihood of future increases (more realistically, decreases) in income. *See*, § III, including fn. 3, above. Furthermore, CCL has addressed the feasibility and requisite duration of the Debtors' Plan. *See*, § I. Moreover, CCL has addressed the preferential treatment, or unfair discrimination, inherent in the Debtors' Plan. *See*, § III, above. In addition to these *Flygare* factors, CCL provides the following:

### b. Material Misrepresentations and Inconsistencies in the Debtors' Filings.

One of the *Flygare* factors often applied by this Court is whether the Debtors' representations in their filings are accurate, and whether such representations are an attempt to mislead the Court. *See*, *In re Lundahl*, *supra*. As evidence of the Debtors' lack of good faith in the present case, the Court need only perform a cursory review of the Debtors' filings herein.

*Debtors' Misrepresentations Regarding CCL's Claim:*

For example, CCL's proof of claim in this case was filed for approximately $86,000.00. In their Plan, the Debtors represent that they are entitled to "damages arising from gross violations of the automatic stay [which] will offset any amounts owed to [CCL]." *See*, Debtors' Plan, § 3. In fact, the Debtors have even argued that after the alleged setoff against CCL's proof of claim, "no amount will be due and owing this creditor – but rather this creditor will owe the

8

debtors money." *See*, Doc. # 33, p. 2. However, in the Debtors' Schedule "B", the Debtors expressly state that their alleged claims against CCL are worth $5,000.00 (at most). *See*, Doc. # 8, p. 22, Subsection "d". *See also*, Doc. # 19, p. 2. Consequently, even if the Debtors were entitled to an offset in the total amount which they claim, CCL's proof of claim would only be reduced by $5,000.00 (to approximately $81,000.00, rather than approximately $86,000.00). Therefore, it is inconsistent and disingenuous (and possibly perjurious) for the Debtors to argue that they are entitled to a setoff of "*any* amounts" owed to CCL. *See*, *In re Cluff*, 313 B.R. 323, 341 (Bankr. D. Utah 2004) ("it seems disingenuous for litigants to take one position in the initial stages of litigation only to take the opposite position when it serves their purposes at a later time."). These material misrepresentations and inconsistencies filed by the Debtors clearly evidence a lack of good faith. Consequently, the Court should refuse to confirm the Debtors' Plan.

*Debtors' Material Misrepresentations Regarding Ownership And Exemptions*:

In addition to the foregoing, the Debtors have also made various material misrepresentations about the status of their alleged secured debt, as well as their alleged exemptions therein. Specifically, the Debtors have claimed that they own the real property in which they are currently residing, and that they are entitled to a statutory homestead exemption therein. *See*, Debtors' Schedule "A", and Debtors' Schedule "C", on file herein. However, the Debtors do not actually own the aforementioned real property, contrary to their representations. *See*, Deed, attached hereto as Exhibit "A" and incorporated herein by this reference. Furthermore, because the Debtors do not own said real property, they are not entitled to an

9

exemption therein.

Specifically, under Utah law a debtor must first own the subject property before claiming a homestead exemption therein. *See*, *inter alia*, *Houghton v. Miller*, 2005 UT App 303, ¶ 7, 118 P.3d 293 (providing that "a property *owner* may declare a homestead exemption…" (emphasis added)). *See also*, UTAH CODE ANN. § 78B-5-503(2)(b) (requiring ownership as a prerequisite to claiming an applicable homestead exemption), and (5)(a) (referring to the homestead exemption claimant as "the owner"). Therefore, while 11 U.S.C. § 522 allows a debtor to exempt certain property from the bankruptcy estate, neither § 522, nor UTAH CODE ANN. § 78B-5-503, serve to create an interest in property that may itself be exempted. *See*, *In re Hart*, 332 B.R. 439, 446 (D. Wyo. 2005). Furthermore, "[n]o property can be exempted (and thereby immunized), however, unless it first falls *within* the bankruptcy estate." *Owen v. Owen*, 500 U.S. 305, 308, 111 S.Ct. 1833, 1835, 114 L.Ed.2d 350 (1991) (emphasis in original). "[O]bviously, then, an interest that is not possessed by the estate cannot be exempted." *Id*. In short, if property does not pass to the bankruptcy estate, "neither can it pass to the debtor as an exempt interest in property." *Id*.

In the present case, the Debtors simply have no ownership rights to the subject property in which the Debtor is attempting to claim a homestead exemption. Rather, the subject property is purportedly owned by R & M Bailey, LLC. As a result, no ownership interest in the subject property is able to pass to the bankruptcy estate. Consequently, if the subject property is not properly part of the bankruptcy estate, the Debtor is factually and legally unable to claim an exemption therein. While the Debtors may now attempt to argue that the subject property is, for all intensive purposes, their own, the facts and applicable legal authority provide otherwise. For

example, "[a] mere right or privilege to reside in a home because a debtor has made payments on the mortgage notes, or the holding of some other equitable interest not capable of valuation is not sufficient to qualify for the exemption claim." *In re Hill*, 11 B.R. 217, 218 (Bankr. S.D. Ohio 1981). Furthermore, "[e]ven if an equitable interest were to be found, such an unrecorded interest would not survive under state law against a bona fide purchaser of the property without knowledge, and therefore, would not prevail over the trustee in bankruptcy who is given those same rights." *Id*. *See also*, *In re Harms*, 7 B.R. 398 (Bankr. D. Colo. 1980).

While this particular issue of Utah's homestead exemption law appears to be one of first impression for this Court, other jurisdictions, as well as the 10th Cir. B.A.P., also support this position. Specifically, in *In re Duque*, 33 B.R. 201 (Bankr. S.D. Fla. 1983), a creditor objected to a debtor's homestead exemption in a home which was owned by a corporation, whose stock was owned 100% by the debtor. The *Duque* Court held that "[i]f stock ownership in the corporation which holds title to a cooperative apartment, together with a clear right of exclusive possession, does not constitute a homestead…it cannot constitute a homestead for purposes of forced sale." *Id*. at 202. Consequently, "[t]he debtor's claimed homestead exemption [was] denied." *Id*. Similarly, in *In re Duncan*, 294 B.R. 339 (10th Cir. B.A.P. 2003), the 10th Cir. Bankruptcy Appellate Panel, also addressed an objection to a claimed homestead exemption by an individual who was not listed on the title to the underlying property. In applying the language of Wyoming's homestead exemption law (which is substantively similar to Utah's counterpart), the Court held that "an ownership interest is a prerequisite to a claim of homestead exemption. On this basis alone, the decision of the lower court [in denying the claim for a homestead

exemption] should be affirmed." *Id*. at 343.

Based upon these and other cases, coupled with Utah's controlling legal authority cited above (requiring the homestead claimant to be an "owner" prior to asserting a homestead exemption), the Debtors' attempted claim of ownership and for a homestead exemption in the subject property is not made in good faith. In fact, the only cases wherein a homestead exemption has been allowed, despite the lack of ownership in the underlying property, is when said underlying property has been titled in a self-settled revocable trust which can be accessed by the debtor's creditors. *See*, *inter alia*, *In re Kester*, 339 B.R. 749 (10th Cir. B.A.P. 2006), and *In re Edwards*, 356 B.R. 807 (Bankr. M.D. Fla. 2006). However, the present case is clearly distinguishable in that the subject property at issue herein is owned by a limited liability company, the assets of which are not accessible to the Debtors' creditors. *See*, *inter alia*, UTAH CODE ANN. § 48-2c-101, *et seq*.

In addition to the foregoing, even if the Debtors were somehow to be considered owners of the subject property at issue, and even if the Debtors were somehow entitled to an exemption therein, the Debtors nevertheless make further material misrepresentations about said property and applicable exemptions. For example, while the Debtors value the subject property at approximately $240,000.00, with only approximately $93,000.00 of encumbrances thereon (resulting in approximately $147,000.00 in equity), the Debtors also argue that any lien which CCL may have on said property (pursuant to CCL's claim of approximately $86,000.00) "impair[s] the Debtors' exemption asserted on Schedule C in that there is no nonexempt equity to which any part of the lien may attach." *See*, Debtors' Plan, § 6(g). Based upon the foregoing

numbers provided by the Debtors, the Debtors' representation regarding the lack of equity is materially misleading and not made in good faith. Specifically, if there is $147,000.00 in equity, minus a joint homestead exemption of $40,000.00 claimed by the Debtors on their Schedule "C", there would still be approximately $107,000.00 of equity in the home to which CCL's alleged interest may attach without impairing the Debtors' alleged $40,000.00 exemption therein. Consequently, the Defendants have knowingly made the representations in § 6(g) without a good-faith basis for doing so. Therefore, the Court should refuse to confirm the Debtors' Plan.

*Other Miscellaneous Misrepresentations*:

In addition to the foregoing, the Debtors have made numerous conflicting misrepresentations throughout the course of this case. As a result, the accuracy and good faith of all the Debtors' filings must be questioned.

For example, the Debtors have filed multiple Schedule "J"'s, wherein the Debtors' income and expenses have varied drastically with each change (but without providing any justification for omitting important amounts from previous schedules). For example, the Debtors' direct payments to a Heloc were only recently included in the Debtors' Schedule "J", dated September 1, 2011 (Doc. # 118), notwithstanding the fact that the Debtors have allegedly been making this payment from the very beginning of this case. *See also,* previous Schedule "J"'s wherein no payment to a Heloc is ever reflected (Doc Nos. 114, 28, p. 2, and 8, p. 37). Similarly, direct payments to AXA were also omitted from the Debtors' previous Schedule "J"'s until August 26, 2011 (Doc. # 114), and have now been omitted again (Doc. # 126, p. 2). *Compare*, Doc Nos. 8, p. 37, and 28, p. 2. The Debtors' monthly income has also changed

dramatically from the first Schedule "J" to the most recent. *See*, Doc Nos. 8, p. 37, and 126, p. 2. The Debtors have also added a car payment (Doc. # 114), and have changed the amount of that car payment (Doc. ## 118 and 126, p. 2). Such inconsistencies and pattern of habitual misrepresentations calls into question the existence of other undisclosed income or expenditures, as well as the Debtors' intentions in omitting such amounts. Consequently, the Court should refuse to confirm the Debtors' Plan.

### c. The Debtors' Motivation and Sincerity.

Another *Flygare* factor which evidences the Debtors' lack of good faith herein is the Debtors' motivation and sincerity. The Debtors have represented that their Plan constitutes their (the Debtors') best efforts to pay their creditors. However, based upon the Debtors' conduct herein, it is apparent that the Debtors are not making a good-faith attempt to do so. For example, while various creditors, including CCL, filed proofs of claim for the amounts owed by the Debtors, the Debtors simply filed almost identical blanket objections to each such proof of claim, without a good-faith basis for asserting said objections. Based upon the Debtors' actions, it was the Debtors' intention to do away with as many creditors as possible, rather than making a good-faith attempt to repay said creditors. Furthermore, based upon the Debtors' express representations in the Preamble to their Plan, it appears that the Debtors have filed this case as some type of litigation strategy against CCL and other similarly situated creditors.

As a further example of the Debtors' lack of good faith in filing said objections, the Debtors objected to CCL's proof of claim on the bases that said claim was allegedly a preference, was not properly supported, was untimely, and was incorrect in its amount. *See*,

Debtors' Objection (Doc. # 33). Each such objection was made without any good-faith basis for doing so. First, the Court specifically set a deadline of January 27, 2011 for creditors to file a proof of claim. CCL filed its proof of claim on January 20, 2011. Therefore, there is simply no good-faith basis behind Debtors' "timeliness" objection. Similarly, CCL attached the Judgment it received against the Debtors to its (CCL's) proof of claim, thus evidencing the existence and exact amount of CCL's claim against the Debtors. Therefore, the Debtors had no good-faith basis for arguing that CCL did not properly support its claim, and that the claim amount was incorrect. Furthermore, the Debtors have done absolutely nothing to show how CCL's claim constitutes a preference, because it does not.

"A validly filed claim is more than 'some' evidence; it is, unless rebutted, 'prima facie' evidence. One rebuts evidence with counter-evidence, not merely a statement in a pleading that the proof of claim is not properly documented." *In re Cluff*, 313 B.R. at 339 (internal quotations and citations omitted). Furthermore, "[o]nce a claim is afforded *prima facie* validity…that evidence is strong enough to prevail over a mere formal objection without more." *Id*. However, as with the Court in *Cluff*, "[t]his Court has also waited patiently for the Debtors to produce some evidence to support their request for disallowance – none has been forthcoming." *Id*. at 342. Coupled with the Debtors' actions as set forth above, "[i]t causes the Court to question the Debtors' motive in filing these unsupported objections." *Id*. Because the Debtors have done nothing to substantiate their baseless objections, despite the excessive amount of time the Debtors have had to do so, the Debtors' actions must be viewed as lacking in good faith. Consequently, the Court should not confirm the Debtors' Plan.

15

Finally, the Debtors have acted contrary to the Court's rulings with respect to CCL's proof of claim. Based upon the Court's minute entry dated 06/16/2011, the Court held that CCL's claim was "to be resolved in [the] State Court proceeding." The State Court proceeding has long since been resolved in favor of CCL (*see*, Doc. # 83), yet the Debtors continue to challenge the validity of CCL's proof of claim. Any counterclaims or adversary proceedings which the Debtors may have had against CCL have all been decided in favor of CCL. Notwithstanding, the Debtors continue to challenge CCL's proof of claim, without any good-faith basis for doing so. Clearly these are not actions of Debtors who are making their best good-faith effort to repaying creditors, or who have filed bankruptcy in good faith. As a result, the Court should refuse to confirm the Debtors' Plan.

### d. Other *Flygare* Factors.

It should also be noted that while the Debtors' Plan is highly irregular in its treatment of various unsecured creditors, in its amount of payments, and the like (all addressed in greater detail, above), there are no special circumstances which would justify the irregularity of the Debtors' Plan. Consequently, the "special circumstances" *Flygare* factor also weighs against the Debtors in this case. Additionally, while CCL is unable to speak for the Trustee, CCL respectfully suggests that the Debtors' Plan creates an unnecessary burden for the Trustee. For example, as noted above, the Debtors' Plan does not provide exactly what type of prorata distribution CCL is to receive from the Plan, if any. Similarly, inasmuch as the Debtors have objected to each proof of claim filed herein (including those filed by secured creditors), the Debtors' attempts to modify such claims has resulted in a situation wherein no one is quite sure

as to what the Debtors' intentions may be. *See*, *inter alia*, Trustee's Continuing Objection to Confirmation, ¶ 5 (Doc. # 110).

In short, all but one[6] of the *Flygare* factors weigh heavily against the Debtors, further evidencing the lack of good faith exhibited by the Debtors herein. As a result, the Court should refuse to confirm the Debtors' Plan.

## CONCLUSION

"The proponent of a Chapter plan...has the ultimate burden of proof as to the requirements of its confirmation." *In re Packham*, 126 B.R. 603, 606 (Bankr. D. Utah 1991). Under the circumstances described above, it is clear that the Debtors cannot satisfy this burden of proof. In fact, based upon the foregoing, there is no question that the Debtors' Plan is not feasible, fails to contribute all of the Debtors' disposable income, unfairly discriminates, and has not been filed in good faith. As such, CCL respectfully requests the Court to deny confirmation of the Debtors' Chapter 13 Plan.

DATED this 27th day of October, 2011.

HANSEN WRIGHT EDDY & HAWS, P.C.

/s/ Morgan L. Cummings
MORGAN L. CUMMINGS
*Attorneys for Construction Capital Lending, Inc.*

---

[6] And the remaining factor, "the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7," is inapplicable in this case.

**MAILING CERTIFICATE**

I hereby certify that the foregoing **OBJECTION**, with its accompanying Exhibits, was served electronically via CM/ECF on the 27th day of October, 2011, to the following:

    Kevin R. Anderson
    ECF NOTIFICATION

    Brian W. Steffensen
    ECF NOTIFICATION

    United States Trustee
    ECF NOTIFICATION

    Steven T. Waterman
    ECF NOTIFICATION

    /s/ Morgan L. Cummings